Good morning. May it please the Court. My name is Cindy Ormsby and I represent the Appellant Defendant Ferguson-Florissant School District in this matter. I'd like to address two reasons the Court should reverse, though our briefs cite many others. First, as to Jingles 1, the District Court relied on too narrow an interpretation of the first Jingles precondition. And second, as to Jingles 3 and Senate Factor 7, the District Court failed to consider evidence presented regarding non-racial reasons that some minority-preferred candidates lost elections, while discounting each and every minority-preferred candidate win in the more probative recent elections. Before I begin, I'd like to respectfully remind this Court that the School District's current election system is mandated by state statute. At-large elections occur each April. School board members serve three-year staggered terms, with two or three seats up each election. And in fact, yesterday was the first day of filing for the April election. Turning now to the first Jingles precondition, whether African Americans are sufficiently large and geographically compact to constitute a majority in a single-member district. Could I ask a question, please, at this point, Counsel? It's not exactly the same as an issue that you raised, but it relates to it. The Jingles construct seems to be mainly at home, and I think was created in a situation where the remedy that was being proposed and looked Correct. So what sense does it make for this first Jingles precondition to be used in every case? I think that's an excellent point, Judge Arnold, because it is not a one-size-fits-all solution, especially in a situation like Ferguson-Florissant School District. And in fact, that was not the remedy that was chosen here. That is correct. It wasn't even proposed until the remedy phase. I mean, it's an interesting datum in any Section 2 case, I guess, but I don't know. I couldn't find any cases that raised this concern that I have. I have the same concern as you do. It is, like I said, it's not a one-size-fits-all solution, and it makes no sense in Ferguson-Florissant School District, where the African American population is evenly dispersed throughout the entire school district. So it's actually beneficial to have one at-large election. You know, all the cases just kind of follow this as a kind of road map, and I can see why, because it's a complex matter, and you're looking for a way through the forest. Well, and as I was just about to state, this is not a usual Voting Rights Act Section 2 case. Normally, there's a much smaller minority population that's more compact. That's not the situation in this case. Thank you. I'd like to be clear first that the school district desires more, not less, minority representation. The school district's defense in this case was never an attempt to discourage that. But the facts of this case, as I just said, do not fit the usual mold of VRA Section 2 cases. The African American voting population in the district is a plurality, if not a majority. Currently, three of the seven board members are African American, all elected under the current at-large system. Because this case is not a conventional Voting Rights Act case, the court must carefully consider, in the liability phase under Jingles 1, whether or not liability exists if a workable remedy does not. The goal of the court in all VRA cases is to increase the opportunity for minorities to elect their preferred candidate. Well, why wouldn't the identification of a workable remedy at the end of the case be good enough? At the end of the liability phase or the remedy phase? The whole case. The whole case. If you're not going to make a system better, then... Yeah, but I mean, here the premise is that it would make the system better, according to the reasoning of the district court. But I'm just saying, why isn't it enough to say, yes, this is a better system and wait? Maybe you don't agree that it is, but wait until the end to come up with a better system. Your Honor, in this case, the district court never compared the proposed remedy to the current system. There was never any comparison between the two. At the liability phase, the court said, I'll consider it at the remedy phase. And at the remedy phase, an entire new remedy was proposed that wasn't even discussed at the liability phase, and that never was that new proposed system compared to the current system. And in reality, cumulative voting is an at-large system. Cumulative voting is really very... It's not much different than what we have. We have bullet voting is permitted under the at-large system. And if people bullet vote, it's the same result as if you give your two votes to the same candidate. So I'm not sure... Really all that dissimilar, why are you not satisfied with it? I'm dissatisfied with the finding that the school district was liable under Section 2. It was not liable. The district court erred when it narrowed its interpretation of Jingles 1, cited in Boneshirt v. Hazeltine. The Boneshirt court stated, and I'm quoting, Because the first Jingles precondition seeks to establish whether a workable solution is possible, the Supreme Court, at this stage, requires only a simple majority of eligible voters in a single-member district. Here, the district court ignored the first half of the sentence and made no attempt to determine whether a workable solution was possible. Despite evidence provided by the school district that plaintiffs' proposed remedies would actually harm the opportunities of minorities to elect their chosen candidates. So the question is, is the court required to analyze whether the proposed system helps or hurts the minority? We believe it is. The district court must, when determining liability under Jingles 1, do an overall analysis of plaintiffs' illustrative plans. Then, during the remedial stage, those plans should be fine-tuned. That's exactly what the court did in Boneshirt, when it analyzed plaintiffs' five illustrative plans presented by plaintiffs. Counsel, you have a question. What do you mean by fine-tuning? We've sort of talked about the analysis at the liability stage versus the remedy, and you've thrown in a, well, you need to do a lot of it at the liability stage and then just fine-tune it in the remedy. What does that mean? I think it means the plaintiffs present illustrative plans, and the district court compares whether or not their proposed plan is better than the current system. If it is, then he finds liability and it goes on to the remedy phase, where then those illustrative plans can be fine-tuned. In this case, the illustrative case presented by the plaintiffs were not even presented, well, they were presented as the third choice of the plaintiffs in the remedy phase. So we had no opportunity ever to discuss whether or not the proposed or preferred remedy of the plaintiffs was an appropriate remedy at all. So my point is, first of all, there's no reason why plaintiffs cannot present something other than single-member districts at the liability phase. There's no case law that says that they could not have proposed cumulative voting at that stage. Are you saying they were required to? I'm not saying they're required to, but they could have. They could have proposed the best system that they believed would improve the current system at the liability phase, and they didn't. All they did was propose two illustrative plans. One of the illustrative plans put two minority candidates in the same district and three white incumbents in the same district, same sub-district, meaning that one of those minority incumbents would no longer be on the board at their first election. They would have to run against each other. Then to solve that problem, they offered a second illustrative plan where the two minority incumbents were put in separate districts. However, one of them was put in a district that had a majority white VAP rather than black voting age population, meaning that our expert said she would probably lose in that district. So neither of the illustrative plans suggested by the plaintiffs would have been better than the at-large system that we currently have, that we believe is the best anyway. Did I answer your question? Just, it seems that the, at least according to the case law, that the standard at the liability stage in determining this is fairly low. It's a plausible, plausibility, not the kind of standard that you're applying that sort of is more attuned to the remedy part. But, Your Honor, I would respectfully disagree in that, like in Bone Shirt, the five illustrative plans were examined by the district court, talked about the percentage of voting age populations in each of those five districts. They were looked at and they were considered. And then at the remedy phase, they picked the best one and they created a new one based on those single member districts. In Stabler, the same sort of thing happened. They looked at the illustrative district, found that it was the voting age populations were too fragile, that it wouldn't work. But that was all done at the liability phase. It wasn't done at the remedy phase. If I go on. It should be noted, let me figure out where I was. As I just stated, Bone Shirt, they analyzed the five illustrative plans presented by the plaintiffs. And then this court agreed in Stabler versus County of Thruston, that when you held that a proposed remedy must be analyzed under this precondition. It should be noted that plaintiffs' illustrative plans provided for four of seven minority-majority single member districts, despite arguing throughout the trial that African-Americans were not the majority of the voting age population. The school district presented ample evidence during trial that single member districts would harm African-American candidates and help white candidates. While plaintiffs put no evidence on the record that single member districts are better than the current at-large system. And when it came to the remedial phase, the plaintiffs no longer preferred single member districts, but rather endorsed cumulative voting, another at-large voting system. In this case, at no point did the district court determine whether single member districts, the very system that the court formed to the basis for liability was harmful, or whether the system violated section two. If no workable remedy exists, there can be no liability. The school district believes the district court relied on too narrow of an interpretation of the first jingles precondition and should be reversed. Now turning to the third jingles precondition, whether the white majority votes sufficiently act as a block to enable it in the absence of special circumstances, usually to defeat the minority preferred candidates. And Senate factor seven, the extent to which minorities have been elected under the challenge electoral scheme. Under both jingles three and Senate factor seven, the district court conducted a straightforward tally of the minority preferred candidates electoral losses. The district court failed to consider evidence presented regarding non-racial reasons that some minority preferred candidates lost elections, while discounting each and every minority preferred candidate win in the more probative recent elections. So is your complaint then that the district court simply considered those factors in a way that you disagree with? Or are you, do you really think that the district court ignored some of them? I do. It was not. Which ones, which, which was, because of the list that you've spoken, it seemed to me that the district court did address a number of the special circumstances and circumstances surrounding the elections. Can you point to one or two that you think in particular that were completely ignored? Exactly. Yes, I can. Under Senate factor seven or jingles three, um, the court did not consider or even mention the fact that in 2011, just prior to the election, the school board voted to provide their former superintendent and his wife lifetime health insurance. That resulted in significant voter anger and anti-incumbent sentiment. None of the three incumbents were reelected that year. There were two white and one black. Dr. Graham, who was the minority incumbent and a longtime board member and had previously been reelected several times, was not elected. There was a lot of testimony. I believe that four lay witnesses and one expert witness testified as to the voter anger about this. This fact was mentioned when considering, I believe Senate factor four, but it was not mentioned at all in his consideration of Senate factor seven. It's simply he just simply tallied up, gave no additional credit to the more recent elections. He counted the 2000 election the same as the 2000. It had the same weight as the 2016, 15 election. It was not mentioned at all. It was not mentioned that in 2014, five African-American candidates ran for the school board with three identified minority preferred candidates. Excuse me, counsel. If I may sort of characterize your article, your argument, I think you're saying that the court should have consulted what might be called special circumstances to explain these results. Is that right? I believe that the courts require that all of the circumstances are considered when determining. It's a kind of. Yeah, but I mean, that's certainly true with respect to the other kinds of elections. But what's your authority for what you're saying in this instance that the circumstances ought to be considered? The First Circuit under UNO held that the district court must make a practical common sense determination based on all of the evidence. And that did not happen here. I guess determination of what, though? The reasons for the losses and wins. Is that what you're saying? Yes, I'm saying that those factors must be taken into consideration. What's your authority for that? I believe we cited cases in our brief extensively on that. I think it was a matter of logic. I understand your I agree. It is a matter of logic, but I will. You know, it's not it's not laid out in the jingles preconditions, right? The way the special circumstances are in the other kinds of elections. The courts are split on whether or not this analysis is done under jingles. Three are under Senate Factor seven. Our argument is it should have been done in one of the two places, and it wasn't done in either. Counselor, you're in your rebuttal time. You can continue if you wish, or you can reserve. Oh, I would like to reserve some time, please. Thank you. Thank you. Thank you. Ms. Ebenstein. Good morning. I may please the court. After a six day trial, the district court performed the intensely fact based practical evaluation of local circumstances affecting the school district elections, just as Section two requires. The court found that the school district's method for electing board members violates the Voting Rights Act because it deprives plaintiffs and other African-American residents of an equal opportunity to vote on an issue important to them. Is there any significance to the fact that this is required by state law? I'm sorry. Is there any significance to the fact that this voting scheme is required by state law? No, Your Honor, the Federal Voting Rights Act has to be complied with even if it's not the same system in a remedy that's spelled out in state law, although it doesn't violate state law, the remedy that was proposed in this case. The trial court made careful determinations on each aspect of the jingle standard. The appellant presents a picture of the school district that's entirely inconsistent with the trial court's findings and seeks to relitigate some of the factual issues that were already determined, including a number of credibility determinations over the six-day trial. The court properly found that plaintiffs met all three of the jingle's preconditions and that under the totality of the circumstances, dilution and liability was supported. Why is the jingle's first precondition relevant in a case where the aim is not a single-member district in the end? Your Honor, what Jingles 1 aims to do, according to Jingles itself, Bone Shirt and Bartlett, is to propose a baseline bright line test, a workable solution that would put the minority group of voters in a position better off than they currently are with the at-large system. So what's been proposed, I believe in every single Jingles case to satisfy Jingles 1 are illustrative plans that show single-member districts, and that's what we did here. I've read those cases, but I'm not clear. I guess I don't quite know what the aim of that is if your endgame is not a single-member district. Well, Your Honor, like I said, it gives a bright line test, so it just shows what the possibility is. Is that. I can think of a lot of bright line tests that wouldn't necessarily be all that relevant is what I'm saying, and that's the advantage of being a bright line. I agree with that. Well, we did propose at the remedy phase three different remedy solutions that we thought would all cure the Section 2 violation. The defendants declined their right to first propose a solution that the court would have deferred to, and we included a single-member district solution that we believe would have the court went with, but it would have been an option. All that's required in Jingles 1, and as it's been shown in every case, I don't know of a single case where a cumulative voting proposal would have been sufficient to satisfy Jingles 1. Again, just walking through the steps of Jingles 1. What is required is illustrative plans that show you can have a majority-minority single-member district, and what plaintiffs proposed were four such districts, three of which had a supermajority black voting age population, one a simple majority. The defendants don't argue with those facts that we produce such illustrative plans, and the Jingles 1 analysis ends there. Moving to Jingles 2, the trial court found that voting is racially polarized and that candidates preferred by black voters received low or minimal crossover support from white voters and were usually successful. The court did consider whether special circumstances were present that led to those successes, but white voters voting as a block were usually successful and usually able to determine. We still saw 75 percent of the black preferred candidates from 2011 up until 2015 unable to get elected to the board, although the special circumstance determination is part of the Jingles 3 analysis. What about the circumstances that opposing counsel raises that she says that the district court did not even consider at all? Is that something within the range of discretion for the district court, or is it an error to not take into consideration the kinds of examples that she provided? Well, Your Honor, the court considered the actual electoral data and outcomes when it looked at Jingles 3. The three issues that defendants raised, the alleged inefficiency of black voters, the narrow margins of defeat, and the insurance question, the judge did consider that in the totality of the circumstances, but he considered and did not think that that overrode the objective facts of the election returns. For example, when it comes to the insurance question, black voters, from what we see in the electoral returns, black voters were actually not anti-incumbent. They preferred two candidates. One was an incumbent. One was not an incumbent. It was white voters who preferred three new white candidates as opposed to incumbents. So we really see a straightforward Jingles 3 application. The black preferred candidates and the white preferred candidates supported, excuse me, the black preferred candidates were different than the white preferred candidates. Every single one of the white preferred candidates won. Both of the black preferred candidates lost. When you look at that, those results, and dilution is a results-focused test, you can see why this reasoning, this insurance reasoning is not relevant. Furthermore, the defendants would call both the black preferred candidates lost in 2011 and a black preferred candidates lost in 2013. They would chalk both of those losses up to this insurance vote. They don't hold white candidates to the same standard. So one of the white preferred candidates who voted for insurance in 2011 was successfully elected in 2012. And one of the white preferred candidates who voted for insurance was successfully elected in 2013. So what we see here is really an attempt to impose a very different standard on those candidates preferred by different groups of voters. Those three concerns, the inefficiency, the margins, and the health insurance, they didn't track the objective facts and they're appropriate to be considered under the totality of the circumstances, which the court did do. I suppose we were to conclude that the district court erred in not considering the circumstances under which minority preferred candidates were defeated. Suppose we thought that was error. Would that necessarily defeat your case? No, Your Honor. I think that even if you were to find that these particular facts did not take the day in the Jingles 3 analysis, they were still considered in the totality analysis and I on Jingles 3. But I believe, correct me if I'm wrong, the district court refused to consider certain exogenous facts that could explain why the minority preferred candidate was defeated for reasons that had nothing to do with race. Doesn't there have to be some kind of, or animus, not animus, but some sort of cause, some sort of causal connection between the defeat of the minority preferred candidate and some kind of racial reason? In other words, is it just enough just to total up the defeats? Your Honor, I don't think... But stay with me here for a moment. Suppose it's not enough, okay? Does that undo your case? What would we have to do, remand it for further findings or simply assume that the district court might have come to the same conclusion anyway and then test that result against the evidence? I mean, what would we do? There's so many, you know, it's possible that some of us might think that one or two things that the district court did were not quite in accordance with what it should have done. But how do we know what to do at that point if we decide that? Well, Your Honor, just to briefly note, the court did recognize that the surest indication that preferences in elections relate to race is racially polarized voting, which he found quite strongly. I don't think that there was any point... There was no evidence. The court was very careful to consider all of the evidence presented. There was quite a bit of evidence. I don't think that there were any exogenous circumstances that the court in any way refused to consider. But I do think it's important to note that racial animus doesn't need to be a cause of race. Racial animus is not relevant, but that's to be some sort of causal connection established. And if there were reasons other than race that could explain the defeat of the minority candidate, and if those reasons should have been consulted by the district court, and if the district court did not consult those, what do we do? Just assume the district court still would have come out the same way? Or should we ask the district court if it would have? Or what would we do when you've got this list of vague, long list of so-called non-exclusive factors that are supposed to be weighed? Your Honor, I think that's both one of the difficulties with the Jingles standard and one of the reasons that there's strong deference to the district court, who hears all of the facts and considers all the facts in its decision. To be clear, Jingles itself says that what's at issue is the difference in choices that black and white voters make, not the reason for those differences. That's Jingles at 63. So if there's another explanation that, or if there are other factors, which there will always be in the fact-intensive circumstances underlying elections that had some influence one way or the other, that doesn't overcome this practical results-focused inquiry into whether voters voted differently and whether the white bloc was able usually to defeat the black preferred candidates. I also think remand would not be necessary simply by looking at the numbers. In 2011, there were two black-preferred candidates who lost while all the white-preferred candidates won. In 2012, there was a black-preferred candidate who lost while the white-preferred candidates won. In 2013, there was a black-preferred candidate who lost while the white-preferred candidates won. And in 2014, there were two white-preferred candidates who won, along with one out of three black-preferred candidates. So, when we're looking at what usually happened and the patterns, there's always going to be underlying facts, but that doesn't negate the court's Jingles 3 determination. Just to make my point clear, my concern has to do with the fact that what the Voting Rights Act prohibits is procedures or standards that deny the right to vote, quote, on account of race or color. We know that that doesn't mean that the system has to have some sort of racial animus behind it. We know that. It doesn't require that the system intentionally discriminate against minority candidates. But the aim of the Voting Rights Act is to prohibit procedures that limit their ability to elect their preferred candidates on account of race or color. So if you've got an election that might reasonably be characterized as one that, although a minority preferred candidate lost, was one that was lost because of something other than race or color, shouldn't you inquire into the circumstances to see if that were true? Your Honor, I believe that the Section 2 standard, the way that it considers on account of race or color, in part, is looking at the Senate factors, which the court went through very carefully and determined way in favor of plaintiffs. And that's because things like a history of discrimination, a slating process that was more available to white candidates, devices that continue to create impediments to black voters' full equal voting strength. All of those are the underlying facts which can create, among other things, an inequality and opportunity to elect candidates of choice without racial animus, which of course we've never claimed in this case. But it's very much the totality determination, and specifically the Senate factors, that show how a history of racial discrimination remains relevant even after some of the official forms of discrimination are no longer on the books. Again, the jingles three analysis that the court performed used qualitative data, as it should, but was not a mechanical application of that data. The court is always obligated to look at whether this totality of the circumstances support liability. And it is a practical and results-focused inquiry, often shown by strong cohesion and racially polarized voting, which the court found here. Just to speak to a few of the points that my colleague raised as far as inefficiency, jingles three does not expect perfect cohesion among black voters. And the large number of black candidates who are not black-preferred is not relevant to the determination of how the black candidates for whom there was cohesive support were unsuccessful. With regard to the special circumstances, the court is obligated, as part of its jingles three determination, to decide whether there were special circumstances in play that affected the election of black-preferred candidates in one particular instance. As I just said here, from 2011, 2012, 2013, and stretching long before that, we saw the difficulty in consistent defeat of black-preferred candidates. The court was obligated and reasonably performed an analysis of Dr. Thurman's success in 2014 because it was not in keeping with the consistent pattern of defeat. That special circumstances determination, along with the determination in 2015, was an obligation of the court. But just to be clear, plaintiffs satisfied jingles three even without affording less probative weight to the 2014 and 2015 election. When the court looked at the number of times or the percentage of the time that black-preferred candidates were defeated by white-block voting, that was 75 percent. So while it noted that it would give these two elections slightly lesser weight, or that the... There's a great deal of evidence in the record that the population trends are clearly in the direction of creating and perhaps, maybe even probably, have already created a black majority in the district. Isn't that, if that's true, isn't that coupled with the fact that the minority-preferred candidates have enjoyed a lot of success in the last three or four elections? Your Honor, the district court specifically rejected that particular argument of the defendant. We show that the black voting-age population is a minority of the voting-age population in the district based on the... It's very close. I agree with that. Yes, Your Honor, it is very close. But, you know, I don't think really the census figures and the ACS figures differ that much. There's no statistical, no significant statistical difference. But what about my point about the trend, the population trend? Two things, Your Honor. First, we agree that there was not a statistically significant difference between the census data and the ACS data, which is why the ACS data didn't overcome the presumptive correctness of the census data. But just to be clear, under either the census data or the ACS data, the black voting-age population is not a majority. The only evidence or opinion that would say that the black voting-age population is an extremely slight majority is defendants' experts' predictions or estimates, which the court found not credible or reliable. So this court would have to find it was error to rely on either the census or the ACS and require the trial court to rely on figures that the trial court specifically found were not credible in order to determine that the black voting-age population was not a minority. As for the growing population that defendants have claimed, dilution is a present-time determination. And it's not sufficient to say that there is dilution, but at some point in the future, the population may change in a way or to a degree to alleviate the dilution at some point going forward. If that were the case and there were changed circumstances, we briefed for the trial court and the court acknowledged that defendants could make a Rule 60B motion for change of their decision. The current system is dilutive of African-Americans' vote. We ask that this court affirm the district court's holding. Thank you. Thank you, counsel. Ms. Wormsby, your rebuttal. If I could make one quick correction. The district court found the school district's trend analysis very credible. It says so in his opinion that the trend analysis by our expert was credible. And I'd like to remind the court that in the 2010 census, there were 386 more white voters than African-American voters in 2010. And if you turn to page 35 on our brief, there's a very good chart that shows the trend analysis. And it's difficult, I believe, to accept the fact that those trends simply ceased in 2010. That does not seem very sufficient. And I'd like to point out that the district court not only provided the ACS data but also the trend analysis together in order to overcome the presumption that the 2010 census was the numbers that the court should rely on. You talked briefly, Judge Arnold, about what happens if you don't agree, if the court considered all of the facts. And I think it's clear that we don't know what facts the district court did consider under the totality of the circumstances because he didn't put that in his decision. Yes, it was 130 pages long, but we don't know what evidence he considered under each one of those nine totality Senate factors that he considered. And under Bacanaga, it's clear that he must tell us in his decision all of the factors pro and con that he considered, and that wasn't done. So under that standard, it should be remanded. However, we believe there is sufficient legal questions here, legal errors, errors as far as the standards. We were to conclude that a reasonable judge could have concluded, could have come to the same conclusion even if that judge had made factual findings that were different from the ones he made. Would that be enough to affirm, or do we have to decide whether he would have come to the same conclusion, or do we have to ask? I believe you have to ask, but I think you can take the district court's own words on this. When he granted our motion to stay his liability and his remedy order, he stated on the record that he believed that a different justice could come to a different conclusion, especially on his analysis of the special circumstances of the more probative recent elections. So even the district court doubted that a different jurist would come to the same conclusion as he did. Of course, the standard on the factual issues is clearly erroneous, right? Correct. And the fact that what he said was clearly right, that reasonable people could differ over this, but that doesn't mean that he was wrong. I think it's important, especially under the special circumstances analysis, to consider the fact that in 2014, the district court, with regard to Dr. Thurman's success that year, that the court admitted in his decision that the plaintiffs had failed to present evidence showing a special circumstance, and yet he still refused to give Dr. Thurman's election the full credit that it deserved, and nor did the court provide any explanation on how these special circumstances did not help the other two minority preferred candidates to win. Same thing in 2015. The court was presented with no evidence of a special circumstance when Dr. Graves was elected. Counsel, your time's expired. Oh, I'm sorry. I would just ask the court to reverse the district court's decision in this matter. Thank you so much. Thank you, Ms. Ormsby. The court wishes to thank both counsel for your argument to the court this morning. The briefing which you've submitted will take your case under advisement and render a decision as promptly as possible. Thank you.